IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JAMIE PANNUNZIO,

                Claimant,

v.

NANCY A. BERRYHILL, Acting Commissioner
of Social Security,

                Defendant.

OPINION AND ORDER

16-cv-165-wmc

---

Claimant Jamie Pannunzio seeks judicial review of a final decision of defendant Nancy A. Berryhill, the Acting Commissioner of Social Security, under 42 U.S.C. § 405(g), which denied her application for disability and disability insurance benefits based on problems with her left knee and right shoulder. On February 2, 2018, the court held oral argument regarding claimant's contention that the decision of Administrative Law Judge Michael Schaefer (the "ALJ") was procedurally wrong for a laundry list of reasons. For the reasons discussed below, the Acting Commissioner's decision will be affirmed.

## FACTS

### A. Background

Pannunzio filed a Title II application for disability and disability insurance on May 8, 2014, alleging that her disability began on April 1, 2013, corresponding with the date of one of her numerous knee surgeries. (AR 17, 21.)[1] Her claim was first denied on July

---

[1] The administrative record is available at dkt. #8.

15, 2014, and again on reconsideration on January 31, 2015. (AR 17.) Claimant filed a written request for a hearing on March 18, 2015, which was followed by a video hearing on November 12, 2015, before the ALJ. (*Id.*) The ALJ then issued a written decision denying her application for benefits on November 27, 2015. (*Id.*)

Born on September 10, 1982, Pannunzio was 30 at the time of her alleged onset date, making her a "younger individual" under the regulations. She has a degree in business management from Everest College, but did not return to work following surgery in early 2013 because she "cannot stand for any long periods of time" and "[t]he doctors never okayed [her] even to go back to work." (AR 64.) Pannunzio also testified that: "I get really bad sharp pains whenever I stand for too long, or my leg will give out and I'll fall. And if I sit without moving it, [my leg] gets real sharp pain or it goes numb. And my leg also has to be elevated at all times." (AR 74.)

## B. Medical Record and Reports

Pannunzio's first knee surgery apparently was in 1998. (*See* AR 473.) Afterward, she tried physical therapy, but when told by her physical "therapist that her knee should be improving," she stopped going. (AR 471, 473.) In April 2013, she had her fifth knee surgery, which was the predicate for her disability claim. (*See* AR 270.) Pannunzio expected a long recuperation period from the surgery (*id.*), and she reported being "very happy with her knee's progress one week out from surgery" (AR 273). However, she did not immediately begin recommended physical therapy and had still not started in June, two months after her surgery. (*See* AR 450.) By August, she reported starting physical therapy, but admitted to missing appointments because of "schedule conflicts." (AR 447.)

2

In November 2013, Pannunzio's surgeon, Dr. Schoeppach, noted that: "She hasn't been in PT. It sounds like she wasn't making progress." (AR 338.) A week later, the doctor's notes show that she "recently discontinued [therapy] at the recommendation of her therapist," but Dr. Cummins "recommend[ed] initiating therapy again or at the very least continuing with it and a home exercise program to work on quad strengthening." (AR 444.) Around the same time, Pannunzio's medical records indicate that her surgeon "felt she was doing okay and recommended continuing to progress with therapy," although she was still using a cane in May 2014. (*See* AR 500.) And during the first half of 2015, Dr. Warren consistently noted that "Jamie feels she is doing well and has minimal discomfort and moderate swelling." (AR 690, 697, 708, 714.) In March and April, he also noted that "[t]here is moderate swelling and good range of motion" (AR 708, 714), which improved to "minimal swelling and good range of motion" in June and July (AR 690, 697). In July, Pannunzio herself felt "like things [were] getting better," and reported that she was "getting back more range of motion." (AR 674.) In April 2015, she was also back in physical therapy. (AR 706.) A June Physical Therapy Initial Evaluation noted "[g]ood rehab potential to reach established goals," such as to "ambulate with cane and equal weight bearing on left and right lower extremity up to 1000 feet; [s]tand/walk for 30 minutes with pain levels no greater than 4/10[; p]erform 60 minutes of aquatic therapy[; and be a]ble to go [u]pstairs with normal pattern." (AR 693.)

As for her shoulder, Pannunzio's self-reports are even more mixed. She reported in April 2012 having had "right shoulder problems for a long time." (AR 290.) In June 2012, however, she denied having a history of shoulder problems. (AR 584.) Then, with shoulder

3

surgery on the horizon months later, her medical records indicate that she again noted that "[t]he pain has been longstanding." (AR 263.) Approximately six weeks after her right shoulder arthroscopy, Pannunzio's records show that "[t]he wound is healed and there is excellent range of motion. The arm can elevate against gravity." (AR 460.) Finally, years later, she complained of "develop[ing] some discomfort with forward elevation." (AR 679.)

Pannunzio's medical records are further complicated by multiple references to drug-seeking or abusive behavior. (AR 452, 525 564, 571, 576, 632.)[2] Her medical providers also expressed doubts as to the severity of her symptoms. (AR 447, 586.) There are also references to her being uncooperative. (AR 281, 297, 525, 576.)

In the fall of 2015, Pannunzio's treating physicians completed "Medical Statement Regarding Knee Problems Forms." In October 2015, Pannunzio's knee surgeon, Dr. Warren, checked off chronic pain, chronic stiffness, chronic swelling, chronic tenderness, limitation of motion, crepitus, instability, and quadriceps muscle atrophy for her left knee. (AR 766.) He also opined that she suffered from "moderate" pain; could work for 2 hours/day; could stand for 15 minutes; could sit for 2 hours at a time; occasionally and frequently lift 5 pounds; occasionally bend and climb stairs; and never stoop, balance, or climb ladders. (AR 767.) However, no written explanation or comments accompanied Dr. Warren's opinions. (*Id.*)

As Pannunzio's primary physician, Dr. Schoeppach's November 2015 form was substantially similar. (AR 768-69.) Schoeppach checked off chronic pain, chronic stiffness, chronic swelling, chronic tenderness, limitation of motion, crepitus, instability,

---

[2] To be fair, she articulates a desire "to be off the medication and be pain-free." (*See* AR 702.)

joint space narrowing, and inability to ambulate effectively for her left knee. (AR 768.) He further opined that: Pannunzio was suffering from moderate and severe pain; she could perform "light duty only," without indicating how many hours she could work each day; she could stand for 15 minutes at a time; that she "need[ed] frequent repositioning," without indicating how long she could sit for; she could never climb a ladder; she could "rare[ly]" (he created that option himself) bend, stoop, balance, or climb stairs; and she needed a cane or crutch to ambulate. (AR 769.) At the same time, Dr. Schoeppach declined to state how much she could lift on either an occasional or frequent basis, and indicated that he did not know if Pannunzio would miss more than three days of work a month. (*Id.*) Dr. Schoeppach's only written comment was "I support disability claim." (*Id.*)

### C. ALJ's Decision

The ALJ found that Pannunzio had not been engaged in substantial gainful activity since her alleged onset date of April 1, 2013, and that she had three severe impairments: left knee dysfunction, right shoulder tendinitis, and obesity. (AR 17, 19.) Still, he determined that these impairments failed to meet the criteria of any listed impairment, and that she could perform sedentary work with eleven limitations: (1) she could "sustain sedentary lifting except that she cannot lift more than 5 pounds from the floor"; (2) she could walk/stand for 2/8 hours with assistance of a cane for walking; (3) she needed to be provided the option to sit or stand at will, so long as she was not off task for more than 10% of the time; (4) she could "occasionally push, pull or operate foot controls" using her left foot, or her right foot without limitation; (5) she could occasionally use ramps or stairs

5

with the assistance of a cane, but cannot use ladders, ropes or scaffolds; (6) she could "occasionally balance and stoop" without use of a cane; (7) she could kneel, crouch, or crawl less than 1/3 of a work period; (8) she could reach with her left arm, but "is limited to frequent reaching in all directions" with her right arm; (9) she needed to avoid "concentrated exposure to extremes of cold, wetness, or humidity"; (10) she had to avoid "moderate exposure to workplace hazards (including moving machinery and unprotected heights)" and (11) she could not operate a motor vehicle. (AR 20.)

In making these determinations, the ALJ agreed that Pannunzio's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but found that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (AR 21.) This credibility determination was based on: (1) complaints of shoulder problems a month before her hearing after years without complaint; (2) her medical records providing support for limitations on her reaching, but not to the extent she claimed; (3) her failure to begin physical therapy in a timely fashion following surgery, compounded with skipping scheduled therapy sessions due to "schedule conflicts," and no evidence showing long-term commitment to therapy; (4) difficulty with compliance and follow-ups, as noted by her doctor; (5) failure to pursue referral for pain management and to exercise or strengthen her muscles; (6) a doctor having described her as "very hyperactive and dramatic throughout the exam," suggesting exaggerated responses; and (7) medical records not documenting flare-ups of pain, instability, swelling and sleepiness, symptoms she testified about at her hearing. (AR 21-22.)

Consistent with the credibility findings, the ALJ gave some weight to the opinion forms signed by Drs. Schoeppach and Warren, but found that they were not entirely consistent with her treatment notes, nor entirely consistent with the evidence. (AR 23.) He also gave Dr. Schoeppach's approval of claimant's request for a disabled parking sticker very little weight due to the difference in standards and that the approval did not seem to reflect her functional abilities. (*Id.*) On the other hand, the ALJ gave great weight to the opinion of state agency consultants, Drs. Chan and Shaw, who found that Pannunzio could only perform sedentary work, in light of their "special program knowledge, and [because] their opinions are generally consistent with the record as a whole." (AR 24.) However, the ALJ incorporated into the RFC those limitations from both treating physicians' opinions that he found consistent with the record. (AR 23.) Finally, based on the testimony of the vocational expert, the ALJ concluded, that Pannunzio would be able to work as a check cashier, telephone solicitor, or telephone quotation clerk. (AR 25-26.)

OPINION

Claimant identifies ten issues necessitating remand, which can broadly be grouped into four categories: (1) the ALJ failed to give controlling weight to the opinions of her treating physicians, Drs. Warren and Schoeppach; (2) the ALJ improperly found that she could perform the full range of sedentary work; (3) the ALJ failed to consider and discuss how her medications' side effects impact her ability to work; and (4) the ALJ improperly discredited claimant's testimony based on her failure to pursue physical therapy. As discussed at oral argument, however, this appeal principally turns on whether the ALJ gave

7

sufficient weight to the medical opinions of Pannunzio's treating physicians.[3]

## I. Discounting Treating Physicians

As noted above, Drs. Schoeppach and Warren provided similar statements concerning Pannunzio's knee problem, agreeing that she suffered from chronic pain, stiffness, swelling, tenderness, limited motion, crepitus, and instability. (*See* AR 766, 768.) However, Dr. Warren opined that she suffered from quadriceps muscle atrophy, while Dr. Schoeppach opined that she suffered from joint space narrowing and an inability to ambulate effectively. (*See id.*) Similarly, while Dr. Warren opined that she could work only two hours a day, Dr. Schoeppach failed to place a time limit on her work capacity, opining that she should be limited to "light duty only." (*See* AR 767, 769.) And though agreeing that Pannunzio could stand for fifteen minutes at a time, Dr. Schoeppach opined that she could "rarely" bend, stoop, balance or climb stairs, while Dr. Warren opined she could never stoop, balance or climb stairs, and only occasionally bend and climb stairs. (*Id.*) Finally, Dr. Warren neglected to provide *any* written commentary, while Dr. Schoeppach stated only that "I support [her] disability claim." (*Id.*)

The major opinion of both treating physicians -- that claimant was disabled -- amounts to a legal conclusion, not a medical opinion. *See* 20 C.F.R. § 404.1527(d) ("Opinions on some issues . . . are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are

---

[3] At oral argument, claimant's counsel conceded that citations to 20 C.F.R §§ 404.1527(d), 404.1529(c)(3) and 416.929(c)(3) in claimant's opening brief were generally to complain that the ALJ's opinion was holistically, procedurally and analytically flawed, not to point the court to the applicability of those regulations in particular.

dispositive of a case."). Opinions that a claimant is disabled, as to the "nature and severity of [her] impairment(s)," and as to residual functional capacity are all reserved to the Commissioner. *See id.* § 404.1527(d)(1)-(2).

Treating Dr. Warren's conclusion that claimant could only work for two hours each day as a medical opinion and not a legal conclusion, the court still could not locate support in Pannunzio's medical records for such a severe limitation. Likewise, there is nothing in Dr. Schoeppach's notes that supports his conclusion that claimant could perform "light duty only," much less that she is disabled.[4]

Moreover, the ALJ did not disregard the more specific findings by claimant's treating physicians. Rather, instead of simply adopting the state agency physicians' opinion that Pannunzio could perform sedentary work, the ALJ incorporated limitations from the treating physicians' opinions. (*See* AR 20.)[5] For example, Dr. Warren opined that claimant could occasionally and frequently lift five pounds (AR 767), and the ALJ restricted her to lifting no more than five pounds from the floor (AR 20). Similarly, Dr. Schoeppach and Dr. Warren opined that she could stand for 15 minutes at a time, while

---

[4] Dr. Schoeppach's opinion in a May 6, 2014 note that Pannunzio "is significantly disabled" cannot provide supporting weight to his later iteration of that opinion. (*See* AR 345.)

[5] As noted above, the ALJ justified his reliance on the state agency physicians' opinions in part because they "have special program knowledge." (AR 24.) At first glance, purported reliance on state agency physicians' "special program knowledge" is concerning, but the ALJ went on to explain why their opinions were also more "generally consistent with the record as a whole," rather than blindly adopting their opinion that claimant could perform sedentary work. The ALJ also explained why he discounted the treating physicians' conclusory opinions. Further, under the then-current regulations, state agency physicians were referred to as "highly qualified physicians . . . who are also experts in Social Security disability evaluation." 20 C.F.R. § 404.1527(e)(2)(i) (2015). While that provision has been removed from the current regulation, 20 C.F.R. § 404.1513a still specifies that state agency physicians "are highly qualified and experts in Social Security disability evaluation." 20 C.F.R. § 404.1513a (effective Mar. 27, 2017).

9

Dr. Schoeppach opined that she "need[ed] frequent repositioning," but declined to say how long she could sit, and Dr. Warren opined that she could sit for two hours at a time (AR 767, 769). Accordingly, the ALJ required that Pannunzio be provided the option to sit or stand at will, so long as she was not off task for more than 10% of the time (AR 20). Finally, Dr. Warren opined that Pannunzio could occasionally bend and climb stairs, but never stoop, balance, or climb ladders (AR 767), and the ALJ limited her to using ramps or stairs occasionally with the assistance of a cane; prevented her from using ladders, ropes or scaffolds; permitted her to "occasionally balance and stoop" without use of a cane; and allowed her to kneel, crouch, or crawl less than 1/3 of a work period (AR 20).

Most of the ALJ's other limitations are also specifically supported by this record, further suggesting the care the ALJ took in crafting an appropriate RFC for this claimant. For instance, the ALJ's limitation that Pannunzio avoid "concentrated exposure to extremes of cold, wetness, or humidity" is supported by her complaints about sensitivity to cold weather. (*See, e.g.*, AR 341.) In fairness, the court could not locate support in the claimant's medical records for two limitations provided by the ALJ: (1) that she could walk or stand for 2/8 hours; and (2) that she could "occasionally push, pull or operate foot controls" using her left foot or her right foot without limitation. At oral argument, however, claimant's counsel conceded that there were no additional limitations that needed to be incorporated from the treating physicians' opinions if she were to work as a check cashier, telephone solicitor or telephone quotation clerk.

## II. Other Criticisms of the RFC

Claimant complains that the ALJ improperly concluded that she could "perform the

10

full range of sedentary work." That is not an accurate portrayal of his opinion: the ALJ concluded that she could perform sedentary work, but with eleven enumerated limitations. Still, Pannunzio identifies three specific shortcomings in the ALJ's RFC. First, she complains that her limitations in "reaching and handling" were not adequately addressed. (Opening Br. (dkt. #9) 2; see also *id.* at 42-43.) After her right shoulder arthroscopy, Dr. Warren noted in January 2013 that she had "minimal discomfort" and "excellent range of motion," such that her "arm can elevate against gravity." (AR 460.) The court could not identify further complaints about her shoulder until 2015. (*See* AR 679.) That supports the ALJ's finding that she could reach. Further, her argument that she could not use her right arm to reach because she uses a cane in that hand (Opening Br. (dkt. #9) 43) is contradicted by an observation in April 2015 that she used the cane in her left hand (AR 702).

Second, Pannunzio complains that the RFC did not account for her need to take frequent breaks. (Opening Br. (dkt. #9) 2.) However, this argument relies on her subjective reports of pain and drug side effects, both of which the ALJ found less than fully credible for reasons explained below.

Third, Pannunzio argues that "unrebutted evidence [shows] that she cannot stoop." (Opening Br. (dkt. #9) 2; *see also id.* at 41-42.) As noted previously, however, the ALJ's RFC limited her to "occasionally . . . stoop[ing]" (AR 20), which was at least generally supported by Dr. Schoeppach's opinion that she could "rarely" stoop (AR 769). Thus, none of claimant's criticisms of the ALJ's formulation of the RFC justify a remand.

11

**III. Credibility**

Finally, claimant Pannunzio argues that the ALJ: (1) failed to consider adequately the side effects of her medications on her ability to work; and (2) improperly discounted her loss of function and pain based on her failure to follow suggested treatment. Both of these criticisms come down to the ALJ's determinations of credibility, which "unless it is patently wrong" will not be overturned. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) ("This court will affirm a credibility determination as long as the ALJ gives specific reasons that are supported by the record for his finding."). The ALJ identified at least seven reasons for finding Pannunzio's statements "not entirely credible" (AR 21-22), which on balance are supported by the record. The ALJ found that her medical records suggested exaggeration of symptoms, and indeed, those records reflect doubts as to the severity of her symptoms even among Pannunzio's personal medical providers. (AR 447 (noting difficulty assessing her because "she is very hyperactive and dramatic"); AR 586 (noting "some concern about the validity of the patient's presentation" with "perplexing" "extreme reaction to light touch").) The ALJ further faulted Pannunzio for trouble with follow-ups and compliance. In addition to the concerns about missing physical therapy, her records contain references to Pannunzio being uncooperative. (AR 281, 297, 525, 576.) In June 2012, she complained about right shoulder pain, then denied having had shoulder problems previously. (AR 584.) Yet she had complained about right shoulder pain a few months before that, reporting it was a condition she had suffered from "for a long time." (AR 290). Nor could the court find references in her medical records to the drowsiness that she complained of at the hearing, even though there were references to

other side effects. (*See* AR 278 (vomiting); AR 634 (dry mouth).)

A large portion of the ALJ's credibility determination turned on Pannunzio's failure to obtain treatment in a timely manner. She argues this was improper because the ALJ did not consider her explanation for missing therapy, then argues that the ALJ failed to inquire about the reason why she did not follow up on physical therapy. (Opening Br. (dkt. #9) 48-50.) However, both parties overlook the fact that Pannunzio provided contemporaneous reasons for failing to pursue further physical therapy. Specifically, in her function report, she noted that "I have done my therapy which it has not helped a single bit, which [I] refuse to do anymore on the leg since it can't handle the basics for strengthening." (AR 201.) At the hearing, Pannunzio further testified that "I've gotten about the full range of motion that I will get out of it, and I was told that my knee will never be right"; she also offered that "I've gotten about the most out of [physical therapy] that I'm going to." (AR 80.)

Tellingly, these justifications are contradicted by the record. First, Pannunzio's pattern of not taking physical therapy seriously predates her April 2013 surgery. For instance, her April 2012 records show that "her knee should be improving by now" (AR 473), but then two months later Pannunzio admits to not going to therapy as scheduled (AR 472). In June 2013, two months after the allegedly disabling, fifth knee surgery, Dr. Cummins noted that Pannunzio "has not started physical therapy," and "she need[ed] to initiate physical therapy." (AR 450.) Again, in August 2013, Dr. Cummins noted that she "[h]a[d] been doing physical therapy, although she has missed several appointments due to schedule conflicts." (AR 447.) Then in September, Dr. Schoeppach warned that "[s]he

13

needs to be putting everything she can into PT" (AR 279), and further noted in November that "[s]he hasn't been in PT" (AR 338). Finally, in November 2013, Dr. Cummins noted that Pannunzio "recently discontinued [physical therapy] at the recommendation of her therapist," despite having "recommend[ed] initiating therapy again or at the very least continuing with it and a home exercise program to work on quad strengthening." (AR 444.)[6]

Second, when she actually did it, Pannunzio's medical records indicate that therapy *was* more beneficial than she let on. For example, her June 30, 2015 Physical Therapy Initial Evaluation -- which admittedly postdates her function reports -- notes that she had "[g]ood rehab potential to reach the established goals," including: "ambulat[ing] with cane and equal weight bearing on left and right lower extremity up to 1000 feet; [s]tand[ing]/walk[ing] for 30 minutes with pain levels no greater than 4/10[; p]erform[ing] 60 minutes of aquatic therapy[; and having the a]bl[ity] to go [u]pstairs with normal pattern." (AR 693.) About two weeks later, Dr. Schoeppach noted that Pannunzio "is doing pool therapy 2 to 3 times a week," that "[s]he feels very good in the water," and that "[s]he feels like things are getting better. She is getting back more range of motion." (AR 674.) This entry came after a telephone note in April noted that claimant "was a no show" for her appointment. (AR 706.)

---

[6] To be fair, her Physical Therapy Initial Evaluation notes in June 2015 that "[l]ast time she was in therapy, she was doing better at the pool, had a skin irritation and had to cancel two appointments. She called into the Rehab department and explained to the reception staff. The reception staff did not relay that to[] her pool therapist and she was discharged." (AR 693.)

Further supporting the ALJ's credibility determination is the fact that physical therapy was not the only treatment claimant declined. In August 2012, claimant complained about right groin pain and articulated a concern about a possible clot; in discussing her need for an ultrasound, "[s]he became very agitated . . . and began yelling," then "[s]he charged out of the room, slamming doors on the way out, before [the staff] could even find out if she could have the ultrasound done [that day]." (AR 297.) In September 2013, Pannunzio also declined seeing the Park Falls dental clinic "for various reasons," despite coming in complaining of dental pain. (AR 569.) Similarly, in October 2013, Pannunzio's records show that Pain Management attempted to contact her several times, and she failed to return their calls, rendering her referral inactive. (AR 520.)

Notably, there are other red flags contained in the record concerning claimant's credibility. For instance, there are multiple references to drug-seeking or abusive behavior. (AR 452, 525, 564, 571, 576, 632.)[7] She testified to using the cane in her right (dominant) hand (AR 81-82), but in April 2015, she was seen "us[ing] a cane on the same side of the injury on the left side" (AR 702). She also testified to napping between six and ten hours throughout the day (AR 85), but in her later function report she said that she napped for one hour during the day (AR 241).

Finally, there is an inconsistency concerning why she stopped working when she did. On her first disability report form, claimant explained that "[she] had also been diagnosed with hepatitis in the emergency room and was told to stop working and it led

---

[7] To be fair, she also articulates at times a desire "to be off the medication and be pain-free." (*See* AR 702.)

into when [she] was going in for knee surgery." (AR 223.) At the hearing, Pannunzio said that she stopped working because "[she] was going to be having [her] knee surgery done." (AR 64.) Dr. Schoeppach noted in January a diagnosis of "viral hepatitis," but he did not think it was accurate. (AR 265, 267.) Ultimately, Pannunzio did not have surgery until April 2013. Further, Pannunzio testified that she had not been cleared to return to work, while her medical records contain statements *by her* that she could not work until her knee improved. (AR 280, 556.) Thus, the ALJ's credibility determination was not patently wrong, and it fails to justify a remand or reversal.

ORDER

IT IS ORDERED that the decision of defendant Nancy A. Berryhill, Acting Commissioner of Social Security, denying claimant Jamie Pannunzio's application for disability and disability insurance benefits is AFFIRMED.

Entered this 19th day of February, 2019.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge